[22 NYS3d 24]

LEND LEASE (US) CONSTRUCTION LMB INC. et al., Appellants-Respondents, v ZURICH AMERICAN INSURANCE COMPANY et al., Respondents-Appellants.

First Department, December 22, 2015

**APPEARANCES OF COUNSEL**

*Carroll McNulty & Kull LLC*, New York City (*Christopher R. Carroll, Jillian G. Ackermann* and *Matthew J. Lodge* of the New Jersey bar, admitted pro hac vice, of counsel), for Lend Lease (US) Construction LMB Inc., appellant-respondent.

*Greenberg, Trager & Herbst, LLP*, New York City (*Richard J. Lambert* of counsel), for Extell West 57th Street LLC, appellant-respondent.

*Mound Cotton Wollan & Greengrass LLP*, New York City (*Philip C. Silverberg, Mark S. Katz* and *Sanjit Shah* of counsel) for respondents-appellants.

**OPINION OF THE COURT**

Andrias, J.

Plaintiffs Extell West 57th Street LLC and Lend Lease (US) Construction LMB Inc. are the owner and construction

manager of a project to erect a 74-story mixed-use hotel and residential building in Manhattan. In this breach of contract and declaratory judgment action, plaintiffs seek coverage under a $700,000,000 builder's risk policy, consisting of five separate policies issued by defendants with identical terms, for damage caused by Superstorm Sandy's dislodgement and partial destruction of a tower crane that was affixed to the building for use in the performance of the construction work.

The insuring agreement provides that the "[p]olicy, subject to [its] terms, exclusions, limitations and conditions . . . insures against all risks of direct physical loss of or damage to Covered Property while at the location of the INSURED PROJECT* and occurring during the Policy Term." Covered Property includes "Property Under Construction" and "Temporary Works."

The policy defines "Temporary Works," as "[a]ll scaffolding (including scaffolding erection costs), formwork, falsework, shoring, fences, and temporary buildings or structures, including office and job site trailers, all incidental to the project, the value of which has been included in the estimated TOTAL PROJECT VALUE* of the INSURED PROJECT* declared by the Named Insured."

The policy excludes coverage for "[c]ontractor's tools, machinery, plant and equipment including spare parts and accessories, whether owned, loaned, borrowed, hired or leased, and property of a similar nature not destined to become a permanent part of the INSURED PROJECT*, unless specifically endorsed to the Policy."

■ The tower crane was integral, not "incidental to the project," and therefore does not fall within the definition of Temporary Works. Even if the tower crane fell within the definition of Temporary Works, the contractor's tools, machinery, plant and equipment exclusion would be applicable and, contrary to the opinion of the dissent, enforceable. Accordingly, the order on appeal should be modified to grant defendants' motion for summary judgment and to declare that defendants have no obligation to provide coverage.

Lend Lease contracted with nonparty Pinnacle Industries II, LLC (Pinnacle) to furnish and install all superstructure concrete work for the project, which was included as a line item in Extell's budget with a value of $89,000,000. The contract provided, inter alia, that Pinnacle would supply "[d]iesel fuel tower cranes, all cherry pickers, any assist cranes,

concrete pumps, and other heavy equipment required for the erection of the building." This included two cranes, whose "locations, lay outs and structural supports required [we]re to be designed by a licensed New York State professional engineer (NYS PE) to meet all NYC DOB, NYC DOT, OSHA and Construction Manager criteria." The contract further provided that Crane 2, the tower crane at issue in this appeal, "[wa]s to be supported by a reinforced slab on the 20th floor, included in this Contract, and associated supporting elements as required."

Pinnacle rented the tower crane from Pinnacle Industries III, LLC (Pinnacle Industries III), a related company, at a cost of $77,000 per month. Under its contract with Lend Lease, Pinnacle was obligated to "secure, pay for, and maintain Property Insurance necessary for protection against loss" of the crane. Pinnacle Industries III also subleased the tower crane to a steel contractor working at the project, Post Road Iron Works, Inc., for $77,000 per month. Pursuant to that sublease, Post Road was obligated to maintain liability and property damage insurance, including "coverage for the contractual liability created by this sublease agreement."

The 750-foot tall tower crane is a massive and sophisticated piece of equipment. Its components include (i) a turntable, which provided it with the ability to rotate as necessary; (ii) a working arm or boom, which was used to physically lift and move various items necessary to the construction of the building; (iii) various counterweights; (iv) a diesel-driven winch pack; and (v) a cab from where its necessary movements were controlled.

To support the tower crane and the loads it carried, Pinnacle built a base on the 20th floor of the building, which was bolted to a large pad of reinforced concrete that was strengthened and stabilized by beams encased into the floor slab. Plates were also cast into the shear walls connected by threaded rods. To provide increased stability, the mast of the tower crane, consisting of over 50 individual sections, was fastened or tied to the structural floor slabs at regular intervals, which required additional steel reinforcement of the slabs. Although the tower crane itself was to be completely removed from the project once its work was done, both the additional beams cast into the slab on the 20th floor, and the reinforcement of the floor slabs at the tie locations, were to permanently remain part of the building following the completion of construction.

On October 29, 2012, high winds from the superstorm caused the tower crane to partially collapse. The boom flipped over

and some parts of the crane broke away, falling to the street below. Extell submitted a claim in the amount of $6,494,723.01 for damage to the tower crane and building, which defendants disclaimed on the grounds that the tower crane did not constitute covered property and/or was excluded property under the policy. This litigation ensued.

An insured bears the burden of establishing the existence of coverage (*see Platek v Town of Hamburg*, 24 NY3d 688, 694 [2015]). Unlike scaffolding, formwork, falsework, shoring and fences, the tower crane is not specifically identified in the definition of Temporary Works. Thus, to obtain coverage, plaintiffs must demonstrate, inter alia, that the tower crane is a "temporary structure" within the meaning of the clause.

In construing policy provisions defining the scope of coverage, courts "first look to the language of the policy" (*Consolidated Edison Co. of N.Y. v Allstate Ins. Co.*, 98 NY2d 208, 221 [2002]), which is "interpreted according to common speech and consistent with the reasonable expectations of the average insured" (*Cragg v Allstate Indem. Corp.*, 17 NY3d 118, 122 [2011]). Thus, "[u]nless otherwise defined by the policy, words and phrases are to be understood in their plain, ordinary, and popularly understood sense, rather than in a forced or technical sense" (*Hartford Ins. Co. of Midwest v Halt*, 223 AD2d 204, 212 [4th Dept 1996], *lv denied* 89 NY2d 813 [1997]).

Although ambiguous provisions "must be construed in favor of the insured and against the insurer," unambiguous provisions "must be given their plain and ordinary meaning" (*White v Continental Cas. Co.*, 9 NY3d 264, 267 [2007]). Thus, courts will "not disregard clear provisions which the insurers inserted in the policies and the insured accepted, and equitable considerations will not allow an extension of coverage beyond its fair intent and meaning in order to obviate objections which might have been foreseen and guarded against" (*Raymond Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 NY3d 157, 162 [2005] [internal quotation marks omitted]).

The test for ambiguity is whether the language of the insurance contract is "susceptible of two reasonable interpretations" (*State of New York v Home Indem. Co.*, 66 NY2d 669, 671 [1985]). "That one party to the agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not render the term ambiguous" (*see Slattery Skanska Inc. v American Home Assur. Co.*, 67 AD3d 1, 14 [1st Dept 2009]). Nor does the lack of a definition, in and of itself, render a word ambiguous (*id.*).

The policy defines a temporary structure as something that is "incidental to the project." Although the term incidental is not defined, "it is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract" (*2619 Realty v Fidelity & Guar. Ins. Co.*, 303 AD2d 299, 301 [1st Dept 2003] [internal quotation marks omitted], *lv denied* 100 NY2d 508 [2003]; *see also R/S Assoc. v New York Job Dev. Auth.*, 98 NY2d 29, 33 [2002]; *Chelsea Piers L.P. v Hudson Riv. Park Trust*, 106 AD3d 410, 411 [1st Dept 2013]).

Black's Law Dictionary (10th ed 2014) defines the term "incidental" as

"[s]ubordinate to something of greater importance; having a minor role." The American Heritage Dictionary of the English Language (5th ed 2011), defines incidental as "[o]f a minor, casual, or subordinate nature." The Merriam-Webster Online Dictionary (http://www.merriam-webster.com/dictionary/incidental) defines the term "incidental" as "being likely to ensue as a chance or minor consequence."

Applying these definitions, the 750-foot tower crane is not a structure that is "incidental" to the project. Indeed, rather than ensuing by chance or minor consequence, as Extell's senior vice-president of construction management acknowledged, the "[b]uilding was specifically designed to incorporate the Tower Crane during construction" and the crane's design and erection involved an "in-depth process" that had to be approved by a structural engineer. Moreover, once it was integrated into the structure of the building, the custom designed tower crane, rather than serving a minor or subordinate role, was used to lift items such as concrete slabs, structural steel and equipment, was integral and indispensable, not incidental, to the construction of the 74-story high-rise, which could not have been built without it. Accordingly, the tower crane does not fall within the policy's definition of Temporary Works.

The application of the rule of ejusdem generis would lead to the same conclusion. Under the rule of ejusdem generis, the meaning of a word in a series of words is determined "by the company it keeps" (*People v Illardo*, 48 NY2d 408, 416 [1979]). "[A] series of specific words describing things or concepts of a particular sort are used to explain the meaning of a general one in the same series" (*Matter of Riefberg*, 58 NY2d 134, 141 [1983]; *see also 242-44 E. 77th St., LLC v Greater N.Y. Mut. Ins. Co.*, 31 AD3d 100, 103-104 [1st Dept 2006]).

The general term "temporary buildings or structures," is described by the specific term "including office and job site trailers." The 750-foot tower crane differs from office and job site trailers in many important ways. Unlike office and job site trailers, the tower crane (i) was furnished pursuant to a contract that included detailed instructions for its placement, design, erection, support and approval; (ii) is a sophisticated mechanized device, whose mast consisted of over 50 individual sections, that could only be operated by a licensed operator; and (iii) intended to physically lift and move various items necessary to the construction of the tower. Indeed, even if the meaning of the word "structure" is to be determined in conjunction not only with office and job site trailers but also with formwork, falsework, shoring and fences, this active participation in the construction work distinguishes the tower crane from those items, which provide access, support, and protection for the facility under construction that are incidental to the project.

The dissent believes that the tower crane is a "temporary structure" that was "incidental to the project." The dissent equates the tower crane to office and job site trailers on the ground that it too is a substantial and critical mechanism employed to construct the tower, which remained on the site for a significant portion of the project, which was dismantled at the project's end. However, this overstates the role office and job site trailers play in the actual construction work and turns the plain meaning of incidental, as something having a minor or subordinate role, on its head. While the tower crane is a mechanism that is integrated into the building and is crucial to the construction of the tower, office and job site trailers do not directly participate in the construction work and may be placed anywhere on or near the construction site.

The dissent disagrees, stating that the only sensible way to avoid reading the phrase "all incidental to the project" as superfluous is to interpret it as a catchall phrase capturing any "temporary structures" not specifically enumerated in the definition. However, a court "may not make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation" (*Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978]) and may not "disregard the provisions of an insurance contract which are clear and unequivocal or accord a policy a strained construction merely because that interpretation is possible" (*Broad St., LLC v Gulf Ins. Co.*, 37 AD3d 126, 131 [1st Dept 2006]). If the definition of Temporary Works was

intended to include all temporary buildings and structures of every ilk, there would have been no need to add the language "including office and job site trailers, all incidental to the project." Thus, the dissent's interpretation, which in essence views every item assembled at the project that will not remain a permanent part of the building as a temporary structure incidental to the project, rewrites the plain language of the policy to include coverage that was never intended. In this regard, it bears repeating that because the Temporary Works clause is not ambiguous, we are not "constrained" to give the benefit of the doubt to plaintiffs, as the dissent asserts.

■ In any event, even if the tower crane could be considered Temporary Works under the policy, damage to it from Superstorm Sandy would not be covered by reason of the contractor's tools, machinery, plant and equipment exclusion.

An insurer bears the burden of proving the applicability of an exclusion of coverage (*Platek*, 24 NY3d at 694). To rely on an exclusion to deny coverage, an insurer must demonstrate "that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case" (*J.P. Morgan Sec. Inc. v Vigilant Ins. Co.*, 126 AD3d 76, 83 [1st Dept 2015] [internal quotation marks omitted]). Defendants have satisfied this burden.

The record establishes that the tower crane is equipment that was used in the building's construction and is not a permanent part of the building. Notably, the tower crane was provided by Pinnacle pursuant to a contract that characterizes it as "heavy equipment." The tower crane is assembled when the project starts, disassembled and completely removed when the project is complete, and then moved to the next job. Thus, adhering to the basic tenets of contract interpretation by reading this exclusion in its entirety and ascribing to it its plain and ordinary meaning, the tower crane, is without question, contractor's machinery or equipment that is excluded from coverage.

In this regard, I agree with the dissent insofar as it rejects plaintiffs' argument that the tower crane does not constitute a tool or piece of equipment because of its size and sophistication. Moreover, contrary to the motion court's determination that there is an issue of fact concerning whether the tower crane was to become a permanent part of the project, merely having a portion of the tower crane's base left in the building is insufficient to remove the crane from the exclusion.

I do not agree with the dissent's conclusion that to enforce the exclusion would render the coverage for Temporary Works illusory because the exclusion is so broad that a plausible argument could be made that any of the items listed in the definition of Temporary Works would also constitute a "[c]ontractor's tool[ ], machinery, plant [or] equipment."

Construction of a clause so broad that it would appear to exclude what, as a practical matter, would be some of the largest foreseeable elements of damages may render coverage "nearly illusory" (*Thomas J. Lipton, Inc. v Liberty Mut. Ins. Co.*, 34 NY2d 356, 361 [1974]). Accordingly, exclusionary policy language should not be enforced when it defeats the main object of the purchased coverage, or virtually nullifies the coverage sought for anticipated risk. However, exclusions by their nature modify the scope of coverage provided in an insurance policy and "[a]n insurance policy is not illusory if it provides coverage for some acts; it is not illusory simply because of a potentially wide exclusion" (*Associated Community Bancorp, Inc. v St. Paul Mercury Ins. Co.*, 118 AD3d 608, 608 [1st Dept 2014] [internal quotation marks omitted]).

Here, the contractor's tools, machinery, plant and equipment exclusion did not render the policy illusory, because the policy provided some benefit to the insured and the exclusion does not negate all possible coverage for Temporary Works. Furthermore, putting aside the dissent's overly broad interpretation of Temporary Works as encompassing virtually anything that pertains to the project, pursuant to the express terms of the exclusion, machinery and equipment is excluded "unless specifically endorsed to the Policy." Thus, under the terms of the contractor's tools, machinery, plant and equipment exclusion, coverage for the tower crane, or any item qualifying as Temporary Works, could have been endorsed onto the policy and the clause does not in and of itself deprive an insured from coverage for the damages he reasonably thought himself insured (*see Thomas J. Lipton, Inc.*, 34 NY2d at 361).

Insofar as the dissent believes that the exclusion does not apply to the tower crane because it is a general provision that conflicts with the specific Temporary Works provision, I note that the tower crane is not specifically included in the Temporary Works provision and that plaintiffs rely on the principle of ejusdem generis to argue that the tower crane is a "temporary structure" within the meaning of that provision. Moreover, "[a]n exclusion . . . serves the purpose of taking out

persons or events otherwise included within the defined scope of coverage" (*Matter of Edwards v Motor Veh. Acc. Indem. Corp.*, 25 AD2d 420, 420 [1st Dept 1966]).

Thus, the clearly worded contractor's tools, machinery, plant and equipment exclusion must be enforced as written to bar coverage under the particular facts of this case.

Accordingly, the order of the Supreme Court, New York County (Eileen A. Rakower, J.), entered on or about January 20, 2015, which denied plaintiffs' respective motions and defendants' cross motions for summary judgment, should be modified, on the law, to grant defendants' cross motions for summary judgment and declare that defendants have no obligation to provide coverage under the builder's risk policy, and otherwise affirmed, without costs.

MAZZARELLI, J.P., (dissenting). Plaintiff Extell West 57th Street is the owner of real property located at 157 West 57th Street in Manhattan. Extell undertook the construction of a 74-floor mixed-use hotel and residential building, known as the One57 building. Plaintiff Lend Lease (US) Construction LMB Inc. served as Extell's construction manager for the project. Lend Lease subcontracted with nonparty Pinnacle Industries II, LLC (Pinnacle) for superstructure concrete work. Pinnacle's work, as provided for in the contract, included the design, furnishing, erection and eventual disassembly of two tower cranes, and was included in a line item on Extell's budget as "Superstructure Concrete" with a value of $89,000,000.

The second crane, which is at issue in this action (the crane), was 750 feet tall and custom-designed. To support the crane, Pinnacle built numerous support mechanisms into the concrete superstructure of the building. The supports included a base that was located on the 20th floor and bolted to a large pad or foundation (pedestal) of reinforced concrete. The pedestal was designed to support the massive size and weight of the crane, as well as the load the crane would be picking up and carrying to construct the building. The pedestal was strengthened and stabilized by adding beams that were permanently encased into the concrete floor slab on the 20th floor. In addition, plates were cast into the walls and connected by threaded rods. To provide increased stability for the crane itself, the mast of the crane, which was made up of more than 50 individual sections, was fastened or tied to the concrete floor slabs at every seventh floor. The ties required additional steel reinforcement of the floor slabs in the locations where the ties were affixed to the slabs.

The construction project was insured by a $700,000,000 builder's risk policy that Extell obtained from defendants. The policy consists of five separate policies issued by defendants, each covering a certain percentage of the policy limits. Zurich covered 50% ($350,000,000); Travelers Excess and Surplus covered 17.14% ($120,000,000); Axis Surplus covered 14.29% ($100,000,000); XL Insurance America covered 14.29% ($100,000,000); and ACE American Insurance covered 4.2857% ($30,000,000). Each policy contained identical provisions.

The policy was an occurrence-based policy and included named storms in the definition of the perils covered. As relevant here, the policy covered "temporary works," defined by the policy as follows: "All scaffolding (including scaffolding erection costs), formwork, falsework, shoring, fences, and temporary buildings or structures, including office and job site trailers, all incidental to the project, the value of which has been included in the estimated total project value of the insured project declared by the named insured" (capitalization and asterisks omitted).

"Total project value" was defined as follows: "The total value of property under construction, temporary works, existing structures (when endorsed to the policy) and landscaping materials; plus labor costs that will be expended in the insured project; plus site general conditions, construction management fees, and contractor's profit and overhead, all as stated in the declarations" (capitalization and asterisks omitted).

The policy also contained several exclusions. The exclusion at issue here states that the policy does not insure against loss or damage to: "[c]ontractor's tools, machinery, plant and equipment including spare parts and accessories, whether owned, loaned, borrowed, hired or leased, and property of a similar nature not destined to become a permanent part of the insured project, unless specifically endorsed to the policy" (capitalization and asterisks omitted).

On October 29, 2012, "superstorm" Sandy made landfall in the New York City metropolitan area. The high winds from the storm caused the crane to partially collapse. The boom flipped over, causing damage to the crane itself and the building. Some parts of the crane broke away, falling to the street below. Once the storm passed, plaintiffs determined that the crane itself and the glass facade of the building had been damaged. The next day, Lend Lease provided notice to defendants of their claim under the policy. Defendants disclaimed coverage.

Extell commenced the instant action for breach of contract and a declaratory judgment, seeking coverage under the policy. Shortly thereafter, before any discovery had been taken, Extell moved for partial summary judgment. Extell sought a declaration that the crane was covered under the policy; judgment as to liability on its claim that defendants breached the insurance contract by wrongfully disclaiming coverage; and limited discovery on the issue of damages. Lend Lease subsequently filed a motion seeking the same relief. Defendants jointly cross-moved for, among other things, a declaratory judgment that the loss is not covered under the policy, contending that the crane was not a "temporary work" as defined by the policy and that, in any event, it fell under the exclusion for "contractor's tools." Defendants argued alternatively that the motion for summary judgment should be denied pursuant to CPLR 3212 (f) to permit discovery on the issue of whether the crane was included in the total project value.

The court denied all of the motions, finding that "[a]mong other issues of fact," there was a question whether the crane was intended to become a permanent part of the project (2015 NY Slip Op 30039[U], *12-13 [2015]).

On appeal, plaintiffs both argue that coverage applies under the provision for "temporary works" since the crane was a "temporary . . . structure[ ]" within the meaning of that provision. They state that because the crane was always intended to be dismantled at the end of the project, it was inherently "temporary." In addition, they rely on the affidavit of an Extell executive who was involved in the procurement of the policy, to establish that in declaring the total project value to defendants, Extell included a line item for "superstructure concrete," and that, pursuant to the contract documents, the crane was incorporated within that item. Regarding the exclusion for "contractor's tools," plaintiffs contend that the crane did not fall within the scope of the exclusion. In any event, they argue, the exclusion is subordinate to the provision covering temporary works, and, to the extent the two provisions conflict, it must give way to the clause affording coverage.

Defendants assert that the plain language of the provision affording coverage for temporary works does not apply to the crane because the crane was too substantial and integral to the construction to be considered "incidental." They further argue that the crane does not fit within the class of "structures" discussed in the provision. Defendants additionally contend

that, regardless of whether the crane was a "temporary structure," it is unclear from the budget that was prepared for the project whether its actual value was included in the total project value, as plainly required by the definition of "temporary works." Finally, defendants claim that the exclusion for "contractor's tools" and the like is applicable, because the crane was not "destined to become a permanent part of the" project, and that it does not conflict with the provision affording coverage. This, they state, is because exclusions are specifically designed to take away what is otherwise covered.

The first issue to address is whether the crane is a "temporary structure" within the meaning of the "temporary works" provision. In reviewing this portion of the policy, it is necessary to determine whether, "afford[ing] a fair meaning to all of the language employed by the parties in the contract and leav[ing] no provision without force and effect, there is a reasonable basis for a difference of opinion as to [its] meaning" (*Federal Ins. Co. v International Bus. Machs. Corp.*, 18 NY3d 642, 646 [2012] [citations and internal quotation marks omitted]). If there is no such reasonable basis, the interpretation of the language used in the definition of "temporary works," based on common speech and the reasonable expectations of the average insured, will determine whether, as a matter of law, plaintiffs are entitled to coverage or whether defendants were justified in disclaiming (*see Cragg v Allstate Indem. Corp.*, 17 NY3d 118, 122 [2011]). If, however, the provision is ambiguous because there is more than one reasonable way to interpret the policy, the construction that favors the insured must prevail (*id.*).

Plaintiffs allow that "temporary . . . structure[ ]" is the only item in the "temporary works" definition that the crane can conceivably be considered. In asserting that the crane was a structure, they rely on cases which have held that a crane was a structure because it was a "production or piece of work artificially built up or composed of parts joined together in some definite manner" (*Cun-En Lin v Holy Family Monuments*, 18 AD3d 800, 801 [2d Dept 2005] [internal quotation marks omitted]; *Cornacchione v Clark Concrete Co.*, 278 AD2d 800, 801 [4th Dept 2000]). In stressing the temporary nature of the crane, they analogize to two Federal Court of Appeals cases. The first is *Landry v G.C. Constructors* (514 Fed Appx 432 [5th Cir 2013], *cert denied* 571 US —, 134 S Ct 212 [2013]), in which, for purposes of determining whether a barge owner had third-

party liability towards a worker who was injured when a crane affixed to the barge leaked oil, the court held that the crane was only a temporary part of the barge (*id.* at 438), since it "was brought onto the Barge for construction-related purposes for the duration of the bridge-building project" (*id.* at 439). The second Court of Appeals case on which plaintiffs rely is *Glacier Constr. Co. v Travelers Prop. Cas. Co. of Am.* (569 Fed Appx 582 [10th Cir 2014]). There the court held that submersible wells and pumps needed to remove excess groundwater from a site before it could be developed, which were intended to be removed once the water removal was complete, were covered property under a builder's risk policy, since the policy covered "[b]uildings or structures including temporary structures while being constructed, erected, or fabricated at the 'job site,' [and] [p]roperty that will become part of a permanent part of the buildings or structures at the 'job site' " (*id.* at 584). Plaintiffs further argue that the canon of construction known as ejusdem generis applies, and dictates that the general term "temporary . . . structures" should be considered in the context of more specific terms such as scaffolding, formwork, falsework, etc. They posit that the crane is akin to those things, so it follows that the provision embraces it.

Defendants contend that the crane does not fall within the enumerated items in the definition of temporary works. They also claim that ejusdem generis supports their interpretation, because the general term "temporary . . . structures" must be read in the context of the more specific terms following it, which are "office and job site trailers," neither of which is related to a crane. Even if the term "temporary . . . structures" were not so limited, they state, a crane still does not constitute a temporary structure. They dismiss the Labor Law holdings cited by plaintiffs as inapplicable because those courts were determining whether a crane was a structure for purposes of liability under Labor Law § 240 (1), which courts are required to construe liberally. They dismiss *Landry* (514 Fed Appx 432) as irrelevant to this dispute, since it did not deal with the definition of "temporary structure" in an insurance policy. As for *Glacier Constr. Co.* (569 Fed Appx 582), they argue that it is distinguishable because it did not involve a tower crane, and because it involved a much broader definition of the term "temporary structures," namely, "[b]uildings or structures including temporary structures while being constructed, erected, or fabricated at the 'job site' " (*id.* at 584). They further

note that the policy at issue in *Glacier Constr. Co.* expressly covered things, such as pumps, which were necessary for "site preparation" (*id.* at 587).

Defendants also contend that the crane cannot be a "temporary work," since it was not "incidental to the project." Relying on the Merriam-Webster Online Dictionary (http://www.merriam-webster.com/dictionary/incidental), they state that "incidental" means "likely to ensue as a chance or minor consequence." Defendants emphasize the complex nature of the construct supporting the crane and the fact that its support structure was partially integrated into the finished building. These facts, they contend, render the crane anything but "minor."

Plaintiffs, relying on Black's Law Dictionary (686 [5th ed 1979]), counter that "incidental" means "[d]epending upon or appertaining to something else as primary; something necessary, appertaining to, or depending upon another which is termed the principal; something incidental to the main purpose." This definition, they posit, does not require that the "incidental" thing be insignificant.

The critical flaw in defendants' position is that they give insufficient consideration to the phrase "all incidental to the project." This clause follows the list of items that are specifically enumerated as "temporary works"—namely, "scaffolding (including scaffolding erection costs), formwork, falsework, shoring, fences"—and immediately modifies the clause "temporary buildings or structures, including office and job site trailers." Defendants argue that the list of specific items excludes anything other than those things, and that, again, employing ejusdem generis, "temporary . . . structures" are limited to office and job site trailers. However, the phrase "temporary buildings or structures" describes things that are, by their very name, incidental to a construction project. Thus, there would have been no reason for the policy to repeat that "temporary buildings or structures" are "all incidental to the project." It is a well established rule of interpretation that no contractual clause is to be construed as being superfluous (*see Travelers Indem. Co. of Am. v Royal Ins. Co. of Am.*, 22 AD3d 252, 253 [1st Dept 2005]). The only sensible way to avoid reading the phrase "all incidental to the project" as superfluous is to interpret it as a catch-all phrase capturing any "temporary . . . structures" not specifically enumerated in the definition. In other words, the "temporary works" definition should be construed as

comprising all of the items that are specifically mentioned, in addition to any similar, unmentioned temporary structures that are "incidental to the project." Contrary to defendants' argument, there is no impediment to considering the crane a "structure." That term is broad enough, and the crane was sufficiently substantial, to conclude that it was a structure for purposes of the policy.

Of course, not every "structure" that is "incidental to the project" would be considered "temporary" for purposes of coverage under the policy. Defendants are correct that the federal Court of Appeals cases cited by plaintiffs are not particularly helpful, since what matters is only whether the crane is a temporary structure as that term is specifically defined in the policy at issue, and those cases did not address a policy with a definition for "temporary structure" that was precisely the same. Instead, to determine whether the crane is a *temporary* structure, it is necessary to turn to the express language of the definition in the policy, aided by the principle of ejusdem generis, on which, as stated, both parties rely. According to this rule of construction, "a series of specific words describing things or concepts of a particular sort are used to explain the meaning of a general one in the same series" (*242-44 E. 77th St., LLC v Greater N.Y. Mut. Ins. Co.*, 31 AD3d 100, 104 [1st Dept 2006]). A close cousin of ejusdem generis is the principle known as noscitur a sociis. This means "it is known by its associates" (Black's Law Dictionary 1087 [10th ed 2014]), and requires the court to consider the context of terms in which another term in need of interpretation falls (*see National Football League v Vigilant Ins. Co.*, 36 AD3d 207, 213-214 [1st Dept 2006]).

Applying these concepts, one must look, in attempting to determine whether the crane falls into the general category of "temporary . . . structures," to the specifically enumerated items in the "temporary works" definition of the policy. These things ("scaffolding [including scaffolding erection costs], formwork, falsework, shoring, fences") have one thing in common, which is that they are all put in place early in a construction project, remain for most or all of the duration of the project, and are significant features of the construction landscape. "[O]ffice and job site trailers" also fall into that category. The crane at issue here is of the same ilk as all of the other items in this category. The crane was, like those other things, a substantial and necessary element of the tower's construction, and, like those things, was intended to remain on the site for a significant

portion of the project, and be dismantled at the project's end. Accordingly, it constituted a "temporary structure" within the specific context of the "temporary works" provision. Further, since this position is based on a strict interpretation of the policy language, it does not, as the majority concludes, view "every item assembled at the project that will not remain a permanent part of the building as a temporary structure incidental to the project."

The majority erroneously describes my position as concluding that the crane is a "temporary structure" because it has the same attributes as office and job site trailers. To be clear, my approach compares the crane to all of the other items listed in the definition, because it views the term "all incidental to the project" as fleshing out the term "temporary . . . structures," without being limited to "office and job site trailers." Additionally, I disagree with the majority's fallback position, which posits that, even if this more expansive approach is correct, the crane can be differentiated by its "active" nature. The critical characteristic of the crane, as far as the policy is concerned, was its integration into the building as the building was constructed, making it a "temporary structure" and thus a covered "temporary work."

Defendants' own effort to apply ejusdem generis is unavailing. Again, in attempting to characterize the language "including office and job site trailers," as narrowing the category of "temporary buildings or structures" to office space, defendants fail to account for the clause that states "all incidental to the project." Further, contrary to defendants' argument, the crane was "incidental" to the project, notwithstanding its critical role in erecting the structure. I accept plaintiffs' definition of the term "incidental," meaning appurtenant to something else that is primary, but still necessary to that primary thing. Here, the primary thing is the project itself (essentially the "property under construction" that is specifically insured under the policy), and the crane is an ancillary yet substantial element of the construction, much as scaffolding, shoring and the other items enumerated in the "temporary works" definition are not intended to be part of the finished building, but are critical to its completion. Defendants' favored definition of "incidental" is not apt. As stated above, in the context of a 74-story building construction in the middle of Midtown Manhattan, none of the items listed in the temporary works definition, such as scaffolding and shoring, ensues "as a chance or minor consequence."

To the contrary, they are crucial and no doubt exceedingly complex elements, but can still be described as "incidental" since they will never be a part of the building itself.

The majority relies heavily on the definition of "incidental" provided by defendants, and supplies other definitions as well, all in an effort to equate the term with things that are minor and arise by chance. However, this is no less "strained" an approach than the majority attributes to me. Indeed, the majority's position ignores the maxim that, in interpreting a contract, "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby" (*Kolbe v Tibbetts*, 22 NY3d 344, 353 [2013] [internal quotation marks omitted]). Dictionary definitions aside, the items chosen by defendants to illustrate the term "temporary works," such as scaffolding, shoring and formwork, are hardly minor, and the majority makes no attempt to explain how such significant components of a construction project could be considered to be so. To be sure, these things may be subordinate to the project itself, but we note that two of the definitions advanced by the majority offer "subordinate" as an alternative meaning for "incidental." "Subordinate" is a relative term, and is not synonymous with "minor." Regardless, and in any event, by including significant construction systems in the definition of "temporary works," defendants indicated that they intended to cover things that were not "minor."

It bears noting that the definition of "temporary works" employed in the policy is hardly a model of clarity, and one cannot state with total certainty that the crane is a "temporary structure." Nonetheless, the interpretation outlined above, which favors coverage, is eminently plausible. Accordingly, even if the definition can be said to be ambiguous, I am constrained to give the benefit of the doubt to plaintiffs, and to find that the crane is a "temporary structure" within the meaning of the definition of "temporary works" (*see Cragg v Allstate Indem. Corp.*, 17 NY3d at 122).

Plaintiffs' next principal argument is that, since the crane is a "temporary structure" pursuant to the policy, the exclusion for "contractor's tools" cannot apply, because it directly conflicts with the provision affording coverage for "temporary works" and effectively negates any possibility of coverage, rendering it illusory. Plaintiffs further contend that the exclusion does not apply on its face because the crane was too complex a piece of

machinery to be considered a mere "contractor's tool." Additionally, they rely on the fact that at least a portion of the structure used to support the crane was to be integrated into the finished building, such that the crane was "destined to become a permanent part of the insured project."

Generally, an insurer has the burden of establishing that there is no reasonable interpretation of an exclusion other than its own (*see Dean v Tower Ins. Co. of N.Y.*, 19 NY3d 704, 708 [2012]). Here, there is no genuine dispute over what the contractor's tools exclusion means; the parties only differ over whether the crane constitutes such a tool. I am not convinced that the crane does not fall within the exclusion merely by dint of its size or sophistication. After all, the terms "machinery, plant and equipment" suggest that major elements of the project could be excluded from coverage. Further, I disagree with plaintiffs that the crane was "destined to become a permanent part of the insured project." To be sure, it was necessary, as a practical matter, for plaintiffs to incorporate certain elements of the crane structure into the building. However, this does not diminish the nature of the crane itself as a tool by which contractors were able to construct the building.

Nevertheless, I agree with plaintiffs that to enforce the exclusion would be to render coverage for temporary works illusory. The exclusion is so broad that a plausible argument could be made that any of the items listed in the definition of temporary works constitutes a "contractor's tool[ ], machinery, plant [or] equipment." This approach does not, as defendants characterize it, ignore that policy exclusions by their very nature take away what affirmative coverage provisions otherwise afford. Nor is the exclusion, as the majority states, merely "potentially wide" (quoting *Associated Community Bancorp, Inc. v St. Paul Mercury Ins. Co.*, 118 AD3d 608, 608 [1st Dept 2014] [internal quotation marks omitted]). Rather, to enforce the exclusion would be to "have the exclusion swallow the policy," a result which is to be avoided (*Reliance Ins. Co. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 262 AD2d 64, 64 [1st Dept 1999] [internal quotation marks omitted]). Further, the items enumerated in the "temporary works" definition are of a narrower and more precise scope than the broad category of items described in the "contractor's tools" exclusion. Accordingly, the doctrine that, in interpreting a contract, a clause addressing specific matters should be given greater weight than one addressing general matters that possibly implicates the specific

clause, applies (*see Bank of Tokyo-Mitsubishi, Ltd., N.Y. Branch v Kvaerner a.s.*, 243 AD2d 1, 8 [1st Dept 1998]; *see also Rocon Mfg. v Ferraro*, 199 AD2d 999, 1000 [4th Dept 1993]).

I disagree with the majority that the final clause in the exclusion, which saves items from the exclusion if they are "specifically endorsed to the policy," is of any moment. That language merely clarifies that if the item is otherwise embraced by the exclusion, it is still covered if plaintiffs purchased an endorsement for it. Certainly the crane "could have been endorsed onto the policy," as the majority states. But it was not, so the language is irrelevant. Reading the exclusion as it applies to the facts in the record, we find that it unfairly deprives plaintiffs of the benefit of their bargain.

Despite my view that the crane is a "temporary structure" and that the "contractor's tools" exclusion does not apply, I would not have granted summary judgment to plaintiffs, since there is an issue of fact whether the value of the crane was "included in the estimated total project value of the insured project declared by the named insured." This is because the plain language of the policy provides that for an item to be covered as a "temporary work," the "value" *of the thing itself* must be included in the total project value. Plaintiffs argue that the value of the crane was included in the total project value, since the line-item of hard costs for the project provided by Extell included a specific item for "superstructure concrete" in the amount of $89,000,000, and that this included all of the work to be performed by Pinnacle in connection with its contract, including provision of the crane. They rely on the affidavit of a senior Lend Lease executive who states that, based on his extensive experience in the industry, the actual market value of equipment such as scaffolding and trailers is never expressly stated in the contract price paid to the subcontractor furnishing those items. He added, however, that the cost of the crane rental was included in the contract price, and that the requirement in the policy that the value be included was thus satisfied. Defendants counter that it is not possible to determine whether the value of the crane was factored into the $89,000,000 contract price. They note that, while the Pinnacle contract clearly provides that Pinnacle was to perform the design, furnishing, erection and disassembly of the crane, Pinnacle did not own the crane, but instead rented it from a separate entity, Pinnacle Industries III, which owned the crane and subleased it to nonparty Post Road Iron Works for the price of $77,000 per month.

The proponent of a motion for summary judgment is required to eliminate all material issues of fact and establish that it is entitled to judgment as a matter of law (*see Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). Summary judgment cannot be awarded on the basis of speculation (*see Porteous v J-Tek Group, Inc.*, 125 AD3d 411, 412 [1st Dept 2015]). Plaintiffs have provided insufficient evidence that the value of the crane itself was included in the total project value. Further, I am not persuaded from their submissions that industry custom dictates that the actual value of equipment itself is never included in a particular line item of a project budget.

In summary, in my view the crane was a "temporary structure" within the meaning of the "temporary works" definition in the policy, and the "contractor's tools" exclusion does not apply. However, a question remains as to whether the "value" of the crane was included in the total project value as required by the "temporary works" provision. To that extent, I agree with the court's denial of summary judgment to both parties.

SWEENY and SAXE, JJ., concur with ANDRIAS, J.; MAZZARELLI, J.P., dissents in a separate opinion in which RICHTER, J., concurs.

Order, Supreme Court, New York County, entered on or about January 20, 2015, modified, on the law, to grant defendants' cross motions for summary judgment and declare that defendants have no obligation to provide coverage under the builder's risk policy, and otherwise affirmed, without costs.